## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SECURE HOME HOLDINGS LLC, *et al.*, | Case No. 21-10745 (xxx) |
| Debtors.[1] | (*Joint Administration Pending*) |

## DECLARATION OF AMY V. KOTHARI IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PAPERS

I, Amy V. Kothari, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Debtors' Chief Executive Officer.  This is a balance-sheet restructuring, supported by the vast majority of the Debtors' creditors.  The Debtors are substantially current on their ordinary course obligations, and request expedited consideration of their prepackaged plan of reorganization to maximize value through preserving customer confidence in the Debtors' world-class security solutions.  To minimize any business disruption caused by the commencement of these Chapter 11 Cases (*as defined below*), the Debtors seek various types of relief through "first day" applications and motions filed contemporaneously herewith (collectively, the "**First Day Papers**").[2]  I submit this declaration (this "**Declaration**") in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Secure Home Holdings LLC (1583); ACA Security Systems GP, LLC (5674); ACA Security Systems LP (3613); Hawk Creation, LLC (3525); and My Alarm Center, LLC (0273).  The address of the Debtors' corporate headquarters is 3803 West Chester Pike, Ste 100, Newtown Square, Pennsylvania 19073.

[2]   Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Papers.

"**Bankruptcy Code**") and (b) First Day Papers.  I am authorized to submit this Declaration on behalf of the Debtors.

2.      I have been employed with the Debtors since 2002, when I joined the organization to become its Chief Financial Officer.  Soon thereafter, I became Chief Operating Officer as well. In 2004, I was appointed Chief Executive Officer.  I have also served as the Debtors' President.

3.      I have more than 25 years of experience in the security industry.  Prior to joining the Debtors' organization, I was Executive Director of CIBC World Markets, where I structured, negotiated, and executed transactions for companies in the security alarm monitoring, cable, radio, television, outdoor-advertising, publishing, and telecommunications industries.  Prior to that, I served as the Vice President of Corporate Finance of CarroSell, Inc., a startup out-of-home media business operating in U.S. airports, and held finance-related positions at Cox Communications and Comcast Corporation.  I hold a Bachelor's degree in both Business and Art History from Franklin & Marshall College, and an MBA in Finance from American University.

4.      As a result of my tenure as the Debtors' Chief Executive Officer and other positions that I have held with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials

that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my supervision, at my direction, and for my use in preparing this Declaration.

## PRELIMINARY STATEMENT

5.      This Declaration is divided into three parts.  Part I provides background information about the Debtors, their business operations, and their corporate and capital structures.  Part II provides a summary of the events leading to the Debtors' commencement of the Chapter 11 Cases and the proposed sale under Bankruptcy Code section 363.  Part III sets forth the relevant facts in support of each of the First Day Papers.

## PART I:

## BACKGROUND

### I.      THE CHAPTER 11 CASES.

6.      On the date hereof (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

7.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

8.      To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed a creditors' committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

### II.      THE DEBTORS' BUSINESS.

#### A.      Description of Business

9.      The Debtors are a national provider of technologically advanced security solutions, including residential and commercial security systems, home automation systems, smoke and

carbon monoxide detectors, and other security solutions in communities throughout the United States.

10.    The Debtors' security solutions include, among others, home security equipment installation, monitoring and support services, "smart" home applications, alarm equipment and support services (smoke, fire, carbon monoxide, flood and intrusion), monitoring services, and premier home security, guard patrols and guard response services.  The Debtors perform most customer service activities in-house, including billing, technical services, customer care and retention, and service support.  For customer accounts procured from certain third parties, the Debtors utilize such third parties to provide customer service to such accounts.  For all customer accounts, the Debtors use certain third parties to provide monitoring and cellular connected home services.  The Debtors' family of security solution brands include such well-known national and regional brands as My Alarm Center™, Alarm Monitoring Service of Atlanta, Hawk Security Services, ACS Security and LivSecure™.

11.    The Debtors' revenues are primarily derived through alarm monitoring contracts. In addition, the Debtors generate revenue from services and installations.  The Debtors generate alarm monitoring contracts through the origination of an alarm monitoring contract and installation of a security system that is licensed to the customer, as well as through the purchase of existing contracts from independent dealers.  On a consolidated basis, the Debtors' 2020 revenues derived from monitoring contracts totaled approximately $88 million, while revenues from services, installation and other sources totaled approximately $7 million.

12.    The Debtors' corporate headquarters are located in Newtown Square, Pennsylvania.  The Debtors maintain regional offices in Los Angeles, California; Atlanta, Georgia; and in Fort Worth, Houston, Tyler, and San Antonio, Texas.  The Debtors' workforce of

approximately 491 full and part-time employees includes call center personnel, security guards, monitoring and central station dispatch staff, service technicians, sales representatives, and administrative staff.  To supplement their workforce, the Debtors also utilize contractors, subcontractors, temporary employees, consultants, and third-party services providers to support billing, the call center, field work, installation and repairs, and various other services.

**B.     The Debtors' Corporate and Capital Structures**

13.     Secure Home Holdings is the direct or indirect parent company of each of the Debtors, which are all incorporated in the United States.  A corporate organization chart of the Debtors is attached hereto as **Exhibit A**.  As of the Petition Date, certain of the Debtors (the "**Prepetition Obligors**") are obligated as borrowers, issuers, or guarantors on two secured credit facilities, referred to as the First Lien Credit Agreement and Second Lien Term Loan (*each as defined below*).  Each of these facilities is secured by a lien on and security interest in substantially all of the Prepetition Obligors' assets.

*(i)     Prepetition First Lien Credit Agreement*

14.     Pursuant to that certain Credit Agreement, dated as of July 14, 2017 (as previously amended, amended and restated, supplemented or otherwise modified, the "**First Lien Credit Agreement**" and the loans thereunder, the "**First Lien Loans**"), by and among, *inter alia*, the Debtors, the lenders from time to time party thereto (the "**First Lien Lenders**") and Seaport Loan Products LLC and Acquiom Agency Services LLC, as co-administrative agents and Acquiom Agency Services LLC as collateral agent (collectively, the "**First Lien Agents**" and, together with the First Lien Lenders and any other secured party under the First Lien Credit Agreement, the "**First Lien Secured Parties**").  The First Lien Credit Agreement consists of a revolving credit facility, a letter of credit subfacility and a swingline subfacility.

15.     Pursuant to and in accordance with the First Lien Credit Agreement and related documents, the Debtors were, as of the Petition Date, indebted to the First Lien Secured Parties in an aggregate amount of approximately $197 million, including accrued and unpaid interest, fees and other claims (the "**First Lien Prepetition Obligations**").

16.     To secure the First Lien Prepetition Obligations under the First Lien Credit Documents, Secure Home Holdings LLC ("**Holdings**"), My Alarm Center, LLC ("**MAC**"), ACA Security Systems, LP (the "**ACA**"), and Hawk Creation, LLC ("**Hawk**," together with MAC and ACA, the "**First Lien Borrowers**") entered into that certain Pledge and Security Agreement dated as of July 14, 2017 (the "**First Lien Security Agreement**"). Pursuant to the First Lien Security Agreement, the First Lien Borrowers granted the First Lien Secured Parties a first-priority security interest in, and continuing liens (the "**Prepetition First Liens**") on, the Collateral (*as defined in the First Lien Security Agreement*) (the "**Prepetition First Lien Collateral**") to and/or for the benefit of the First Lien Secured Parties. The Prepetition First Lien Collateral includes substantially all of the assets of the Debtors, other than certain customary excluded collateral.

### *(ii)     Second Lien Credit Agreement*

17.     Pursuant to that certain Credit Agreement dated as of July 14, 2017 (as amended, the "**Second Lien Credit Agreement**" and, together with all the related documents, guaranties and agreements, collectively, the "**Second Lien Credit Documents**") by and among MAC, Hawk, and ACA (ACA, together with MAC and Hawk, the "**Second Lien Borrowers**"), Goldman Sachs Specialty Lending Group, L.P., as administrative agent (in such capacity, the "**Second Lien Agent**"), and the lenders party thereto (the "**Second Lien Lenders**" and, together with the Second Lien Agent, the "**Second Lien Secured Parties**," and together with the First Lien Secured Parties,

the "**Prepetition Secured Parties**").  The Second Lien Credit Documents provided for a term loan facility in an aggregate amount of $32,000,000 (the "**Second Lien Term Loan**").

18.     Pursuant to and in accordance with the Second Lien Credit Documents, the Debtors were, as of the Petition Date, indebted to the Second Lien Secured Parties in an aggregate amount of approximately $34 million, including accrued and unpaid interest, fees and other claims (the "**Second Lien Prepetition Obligations**").

19.     To secure the Second Lien Obligations under the Second Lien Credit Documents, the Second Lien Borrowers entered into that certain Pledge and Security Agreement dated as of July 14, 2017, with the Second Lien Agent (the "**Second Lien Security Agreement"**). Pursuant to the Second Lien Security Agreement, the Second Lien Agent was granted, for the benefit of itself and the other Second Lien Secured Parties, a second-priority security interest in, and continuing liens (the "**Prepetition Second Liens**"), junior in all respects to the Prepetition First Liens, on substantially all of the Collateral (*as defined in the Second Lien Security Agreement*) (the "**Prepetition Second Lien Collateral**," and together with the Prepetition First Lien Collateral, the "**Prepetition Collateral**") to and/or for the benefit of the Second Lien Secured Parties. The Prepetition Second Lien Collateral includes substantially all of the assets of the Debtors, other than certain customary excluded collateral.

## PART II:

## EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

20.     Prior to the onset of the COVID-19 pandemic, in late 2019, the Debtors sought an amendment to their revolving credit facility to avoid certain projected potential covenant defaults. The Debtors were unable to obtain the necessary consents to amend the facility, however, and the projected covenant violations occurred.  The covenant violations reduced the Debtors' ability to

access funds under the revolving credit facility, and, as a result, hampered their ability to replace attrition and grow their business by generating new contracts and acquiring contracts originated by third parties.

21.    The Debtors and their advisors, including the investment banking firm of Raymond James and Associates, Inc. ("**Raymond James**"), then began to pursue a number of potential acquisitions with strategic targets, seeking an acquisition transaction with an intent to drive synergies and incremental cash flow that could provide a platform for a recapitalization.   In addition, the Debtors and their advisors explored potential sale transactions to prospective financial and strategic acquirers and contacted numerous potential debt financing parties to explore potential refinancing opportunities.

22.    The Debtors' business has also been negatively impacted by the COVID-19 pandemic.   Historically, a significant portion of the Debtors' customer contracts resulted from door-to-door sales activity and in-home installations, but these activities came to an abrupt halt with the onset of the pandemic and mandatory state-wide stay-at-home orders.   Although restrictions have partially eased in many locales, the Debtors' door-to-door sales and in-home installations continue to be lower than pre-pandemic levels.

23.    At the same time, the Debtors have faced increased costs directly related to COVID-19, including maintaining personal protective equipment for employees, additional cleaning required for offices and vehicles, transitioning their workforce to remote working, additional communications with customers, and additional overtime costs as employees were asked to cover for others who could not continue to work.

24.    The pandemic also impacted the Debtors' efforts to raise capital and pay down debt. Prior to the pandemic, the Debtors had signed letters of intent with two parties for certain asset

divestitures, and confirmatory diligence was nearly completed. However, both potential purchasers materially reduced their offers post-pandemic, rendering the transactions no longer viable.

25.    Finally, as discussed in more detail below, as a result of the current economic environment, disruption within the home security industry, and the decision by two of the Debtors' major lenders to exit all home security loans, the Debtors defaulted under both of their credit agreements. These defaults left the Debtors unable to draw on their revolving credit facility. The Debtors also lack significant cash reserves.

26.    Seeking additional liquidity to extend the time available to pursue a transaction, on April 27, 2020, the Debtors obtained a $6.8 million government loan under the federal Paycheck Protection Program (the "**PPP Program**") made available pursuant to the Coronavirus Aid, Relief, and Economic Security Act of 2020 (the "**CARES Act**"). As a result, the Debtors are subject to mandatory audit by the United States Small Business Administration with respect to their use of such proceeds, and the board's approval of the Debtors' participation in the PPP Program was conditioned upon the Debtors' use of the proceeds to maximize the forgiveness features of the program. Accordingly, the Debtors utilized the PPP loan proceeds primarily to cover their payroll, rent, and utility obligations.

27.    While the Debtors undertook to participate in the PPP Program in order to extend their runway for a potential out of court transaction or solution, the issuance of a notice of default by the Debtors' Prepetition Secured Parties, discussed below, severely constrained the Debtors' ability to do so.

28.    On May 11, 2020, the Debtors' Prepetition Secured Parties issued the Notice of Events of Default, Acceleration, Imposition of Default Rate, Intent to Engage Financial Advisor,

and Reservation of Rights (the "**Notice**").  Pursuant to the Notice, the Debtors' loans were declared to be in default, accelerated, and interest began to be charged at the default rate.  Thereafter, the Debtors and their lenders entered into forbearance agreements to allow for the continued pursuit of an M&A solution.

29.    The forbearance agreements, among other things. required the appointment of a Chief Restructuring Officer ("**CRO**") and imposed certain milestones for refinancing and transaction proposals in exchange for the lenders' forbearance from exercising remedies.  The Debtors thereafter engaged Mohsin Meghji as CRO and M3 Partners, L.P. to provide supporting services to assist Mr. Meghji in his role as CRO.[3]  The Debtors also engaged the law firms of Skadden, Arps, Slate, Meagher & Flom LLP and Chipman Brown Cicero & Cole LLP as legal counsel.  At this time, the Debtors also amended their engagement letter with Raymond James and Associates, Inc. to include restructuring service in additional to M&A advisory services.

30.    During this time period, the Debtors continued to seek out M&A transactions with prospective strategic and financial acquirors.  As described in detail in the *Declaration of Geoffrey Richards In Support of the Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D) and 364(E), (B) Granting Senior Liens and Superpriority Administrative Expense Status; (II) Scheduling Final Hearing; and (III) Granting Related Relief* (the "**Richards Declaration**"), filed herewith, the Debtors, the CRO, and their advisors pursued multiple potential refinancing proposals, recapitalizations and potential sale transactions with prospective purchasers.  Numerous potential lenders and acquirors were

---

[3]    Recently, Keshav Lall of M3 Partners, L.P. has joined Mr. Meghji as co-CRO.

solicited, data rooms were established, and due diligence was conducted, eventually resulting in several letters of intent for potential going concern sales. The forbearance agreements were amended and extended multiple times to permit these processes and negotiations to continue.

31.     As a result of these efforts, the Debtors eventually garnered the support of their First Lien Lenders with respect to a letter of intent that contemplated a sale transaction with a third party. After an extended six-week exclusivity period, the buyer informed the Debtors that it would not be able to clear financing contingencies to allow it to consummate the contemplated sale.

32.     The Debtors and their advisors promptly pivoted to further engage with the majority holder of the Debtors' First Lien Prepetition Obligations, Invesco, and the remainder of the First Lien Lenders with respect to an alternative transaction and restructuring proposal. After further negotiations, the Debtors reached an agreement with the First Lien Lenders on the terms of a prepackaged plan of reorganization (the "**Plan**"). The Plan will, upon confirmation and the occurrence of the effective date, distribute the equity in the Reorganized Debtors to the First Lien Lenders and will provide for the payment in full of administrative, priority and other secured claims. The Plan further provides for the assumption of the Debtors' executory contracts and unexpired leases, subject to the exclusion of those that may be identified as rejected.

33.     The Plan and the transactions contemplated thereby preserves the Debtors' operations and ability to continue to provide uninterrupted services to their customers. The Plan provides the most efficient and cost-effective path forward for the Debtors, will maximize recovery for the First Lien Lenders and other constituents, and will preserve jobs for the Debtors' employees.

34.     The Debtors anticipated the need for post-petition financing. In late March, Invesco provided the Debtors with a proposed term sheet for debtor in possession financing (the "**DIP**") to

fund the costs of the Chapter 11 Cases. The proposal, which has since expanded to include Invesco and the remaining First Lien Lenders (together, the "**Proposed DIP Lenders**"), is reflected in a DIP Credit Agreement that provides for a proposed $15 million "new money" DIP facility, together with a "roll up" of $30 million of the First Lien Prepetition Obligations, at a competitive coupon rate and fee structure (the "**DIP Facility**").

35.    As described further in the Richards Declaration, the Debtors' investment banker, Raymond James, conducted a market check by seeking competing DIP financing offers. No other proposals were received. Based upon Raymond James' efforts to arrange refinancing with prospective lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.

36.    Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases. Importantly, the DIP Facility was negotiated at arms' length among the proposed DIP Lenders and the Debtors' proposed counsel and advisors.

37.    The Debtors do not have the ability to borrow under their existing First Lien Credit Agreement. The Debtors require funds to sustain their operations and pay for the costs of the Chapter 11 process. In light of the prepackaged Plan, the timeline for the Debtors' stay in Chapter 11 will be materially shortened, but the Debtors nonetheless require the funds to be provided under the DIP Facility to support their operations and the costs of the Chapter 11 Cases, and to achieve Plan confirmation and consummation. The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their businesses while providing sufficient liquidity to administer these chapter 11 cases and facilitate the Plan process.

## PART III

## FIRST DAY PLEADINGS[4]

38.     To facilitate their restructuring efforts, the Debtors have filed the First Day Pleadings, each as listed on the attached **Exhibit B**, concurrently with this Declaration.

39.     I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

40.     I believe that the relief sought in each First Day Pleading is vital to enable the Debtors' transition into Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value, is necessary to avoid immediate and irreparable harm, and constitutes a critical element in maximizing value during these Chapter 11 Cases.

41.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety.

Dated:       April 25, 2021
             Newtown Square, Pennsylvania

                              By:    /s/ Amy V. Kothari
                              Name: Amy V. Kothari
                              Title:  Chief Executive Officer

---

[4]   Capitalized terms used but not defined in Part II have the meanings ascribed to them in the relevant First Day Pleading.