# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **SECURE HOME HOLDINGS LLC**, *et al.*, | Case No. 21-10745 (___) |
| Debtors.[1] | (Joint Administration Pending) |

**DECLARATION OF GEOFFREY RICHARDS IN SUPPORT OF THE MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) AND 364(e), (B) GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) SCHEDULING FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Geoffrey Richards, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Secure Home Holdings LLC (1583); ACA Security Systems GP, LLC (5674); ACA Security Systems LP (3613); Hawk Creation, LLC (3525); and My Alarm Center, LLC (0273). The address of the Debtors' corporate headquarters is 3803 West Chester Pike, Ste 100, Newtown Square, PA 19073.

1. I am a Managing Director of Raymond James & Associates, Inc. ("Raymond James"), which has its principal office at 880 Carillon Parkway, St. Petersburg, Florida 33716. I am authorized to make this declaration on behalf of Raymond James in support of the Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e), (B) Granting Senior Liens and Superpriority Administrative Expense Status; (II) Scheduling Final Hearing; and (III) Granting Related Relief (the "**DIP Motion**").

2. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein or provide this declaration based upon information provided to me by other Raymond James professionals. Specifically, I have overseen the Raymond James team advising the Debtors on this engagement.

3. I am authorized to submit this Declaration on behalf of the Debtor and am over the age of 18. If I were called upon to testify, I could and would testify to each of the facts set forth below.

A. **Raymond James and its Engagement by the Debtors**

4. Raymond James is a subsidiary of Raymond James Financial, Inc. ("**RJF**"), a publicly traded (NYSE:RJF) full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and other service offerings to individual and institutional clients.

5. Raymond James has a dedicated restructuring investment banking group of 25 bankers with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, or

bankruptcy proceedings. Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, financing, financial opinion, and special advisory transactions. RJF and its subsidiaries employ over 10,000 individuals in the United States alone, of which approximately 325 provide investment banking advisory services to firm clients. Since 2015, Raymond James has participated in raising nearly $300 billion in capital for its corporate clients and completed more than 925 advisory assignments, including more than 800 M&A buy-side or sell-side advisory assignments.

6. Some representative engagements that investment bankers at Raymond James have led in prior chapter 11 cases and restructurings include: *American Eagle Energy Corporation*; *American IronHorse Motorcycles, Inc.; ATLS Acquisition, LLC; BI-LO, LLC; Bluestem Brands, Inc.; Buccaneer Energy; Calpine Energy; CB Holding Corp.; CCNG Energy Partners; ColorSpot Holdings, Inc.; Dakota Plains Holdings, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Halt Medical, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; Hooper Holmes, Inc.; International Garden Products, Inc.; Just One More Restaurant Corp.; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; LVI Intermediate Holdings, Inc.; Max & Erma's, Inc.; National Envelope Corporation; Personal Communication Devices, LLC; Phoenix Payment Systems, Inc.; Proteus Digital Health, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.*; and *SP Newsprint Holding LLC*.

7. The Debtors selected Raymond James because Raymond James's professionals have considerable expertise and experience in providing investment banking services to

financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings.

8. I have more than 25 years of experience in financial restructuring and distressed M&A. I have advised more than 100 public and private companies, private equity sponsors, hedge funds, purchasers of distressed assets and businesses, key secured and unsecured creditors, DIP lenders, and creditors' committees. Before joining Raymond James, I led the North America Debt Finance & Restructuring business at Canaccord Genuity. Prior to that, I started the special situations and restructuring practice at William Blair & Company that consummated more than 40 transactions in 5 years. Before joining William Blair, I was a partner with Kirkland & Ellis in the restructuring group. Since 2001, I have taught the class "Corporate Restructuring" at Northwestern Pritzker School of Law as an adjunct professor.

**B.    Prepetition M&A, Recapitalization and Refinancing Efforts**

9. The facts and circumstances leading to the commencement of these Chapter 11 Cases are set forth at length in the *Declaration of Amy V. Kothari in Support of Chapter 11 Petitions and First Day Papers* (the "**First Day Declaration**").

10. Raymond James was engaged prior to the Petition Date to provide investment banking services to the Debtors pursuant to the Engagement Letter. Raymond James has been engaged as investment banker to the Debtors since May 2020.[2] Since its engagement, Raymond James has worked closely with the Debtors' board of directors, management team and other professional advisors to assist the Debtors in evaluating various strategic and financial alternatives.

---

[2] The Debtors first retained Raymond James in May of 2020. Pursuant to the Engagement Letter, the Debtors' prior engagement agreements with Raymond James have been amended and restated in their entirety and the Engagement Letter governs the terms of Raymond James's services.

11. Specifically, Raymond James has assisted the Debtors in analyzing their liquidity and cash flows, evaluating in- and out-of-court restructurings alternatives, conducting a strategic review and assessing potential M&A opportunities in the industry, preparing for the Chapter 11 Cases, and seeking to secure postpetition financing on the most competitive terms and conditions available to the Debtors. As a result of Raymond James's work to date, Raymond James has become well-acquainted with the Debtors' business operations and financial affairs, including the Debtors' current liquidity situation and financing requirements.

12. When Raymond James began to work for the Debtors, the Debtors' covenant violations had already reduced the Debtors' ability to access funds under the revolving credit facility. The Debtors and Raymond James began to pursue a number of potential acquisitions with strategic targets, seeking an acquisition transaction with an intent to drive synergies and incremental cash flow that could provide a platform for a recapitalization. In addition, the Debtors and Raymond James explored potential sale transactions to prospective financial and strategic acquirers and contacted numerous potential debt financing parties to explore potential refinancing opportunities.

13. The Debtors encountered challenges in pursuing an M&A solution. The Debtors received letters of intent from two parties for certain asset divestitures, and confirmatory diligence was nearly completed. However, both potential purchasers materially reduced their offers post-pandemic, rendering the transactions no longer viable.

14. The Debtors continued to seek out M&A transactions with prospective strategic and financial acquirors following the issuance of a default notice by the Debtors' Prepetition Secured Lenders. The Debtors pursued multiple potential refinancing proposals, recapitalizations and potential sale transactions with prospective purchasers. Numerous potential lenders and acquirors were solicited, data rooms were established, and due diligence was conducted, eventually resulting in several letters of intent for potential going concern sales. The forbearance agreements were amended and extended multiple times to permit these processes and negotiations to continue.

15. As a result of these efforts, the Debtors eventually garnered the support of their First Lien Lenders and entered into a letter of intent that contemplated a sale transaction with a third party and an initial two-week exclusivity period. As the Debtors continued to negotiate the details of the contemplated sale with the third party buyer and their First Lien Lenders, they agreed to two subsequent two-week extensions of the exclusivity period. Substantially concurrent with the expiration of the exclusivity period (as extended), the buyer informed the Debtors that it would not be able to clear financing contingencies to allow it to consummate the contemplated sale.

16. The Debtors and their advisors promptly pivoted to further engage with the majority holder of the Debtors' First Lien Prepetition Obligations, Invesco, and the remainder of the First Lien Lenders with respect to an alternative transaction and restructuring proposal. After further negotiations, the Debtors reached an agreement with the First Lien Lenders on the terms of a prepackaged plan of reorganization (the "**Plan**"). The Plan will, upon confirmation and the occurrence of the effective date, among other things, distribute the equity in the Reorganized Debtors to the Proposed DIP Lenders and the First Lien Lenders, and will provide for the

payment in full of administrative, priority and other secured claims. The Plan further provides for the assumption of the Debtors' executory contracts and unexpired leases, subject to the exclusion of those that may be identified as rejected.

17. The Plan and the transactions contemplated thereby preserves the Debtors' operations and ability to continue to provide uninterrupted services to their customers. The Plan provides the most efficient and cost-effective path forward for the Debtors, will maximize recovery for the First Lien Lenders and other constituents, and will preserve jobs for the Debtors' employees.

### C. The Proposed DIP Financing

18. The Debtors anticipated the need for post-petition financing. In late March, Invesco provided the Debtors with a proposed term sheet for debtor in possession financing (the "**DIP**") to fund the costs of the Chapter 11 Cases. The proposal, which has since expanded to include Invesco and the remaining First Lien Lenders (together, the "**Proposed DIP Lenders**"), is reflected in a DIP Credit Agreement that provides for a proposed $15 million "new money" DIP facility, together with a "roll up" of $30 million of the First Lien Prepetition Obligations, at a competitive coupon rate and fee structure (the "**DIP Facility**").

19. Under my direction, Raymond James conducted a market check by seeking competing DIP financing offers from the Debtors' Second Lien Lenders and twelve (12) other prospective lenders. No other proposals were received. The primary reasons for the lack of competing proposals are because (i) the First Lien Lenders are unwilling to permit a priming lien in favor of a third party, and (ii) the other potential lenders are unwilling to provide a DIP facility junior to the First Lien Lenders. Based upon Raymond James' efforts to arrange refinancing with

prospective lenders, the Debtors and their advisors believe that no other, better options for DIP financing are available to them other than the proposed DIP Facility.

20. Ultimately, the Debtors, in conjunction with their advisors, determined that the terms and conditions of the proposed DIP Facility were and remain the best and only available under the circumstances and adequately addresses the Debtors' financing needs during these Chapter 11 Cases. Importantly, the DIP Facility was negotiated at arms' length among the proposed DIP Lenders and the Debtors' counsel and advisors.

21. The Debtors do not have the ability to borrow under their existing First Lien Credit Agreement. The Debtors require funds to sustain their operations and pay for the costs of the Chapter 11 process. In light of the prepackaged Plan, the timeline for the Debtors' stay in Chapter 11 will be materially shortened, but the Debtors nonetheless require the funds to be provided under the DIP Facility to support their operations and the costs of the Chapter 11 Cases, and to achieve Plan confirmation and consummation. The DIP Facility is the best and only path forward to ensure that the Debtors can continue operating their businesses while providing sufficient liquidity to administer these chapter 11 cases and facilitate the Plan process.

**WHEREFORE**, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 25, 2021

*/s/ Geoffrey Richards*
Geoffrey Richards
Managing Director
Raymond James & Associates, Inc.

*Proposed Investment Banker to the Debtors and Debtors in Possession*